**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(NORTHERN DIVISION)**

| | |
|---|---|
| **STEPHEN BRIANAS**<br>76 Summerfield Drive<br>Annapolis, Maryland 21403<br>*Resident of Anne Arundel County* | Civil Action No.: |
| Plaintiff, | Collective Action Claim |
| ***Individually and on Behalf of All***<br>***Similarly Situated Employees*** | |
| v. | <u>Jury Trial Requested</u> |
| **UNDER ARMOUR, INC.**<br>1020 Hull Street, 3rd Floor<br>Baltimore, Maryland 21230 | |
| Serve:  The Corporation Trust, Inc.<br>2405 York Road, Suite 201<br>Lutherville, Maryland 21093 | |
| Defendant. | |

## <u>CLASS AND COLLECTIVE ACTION COMPLAINT FOR WAGES OWED</u>

STEPHEN BRIANAS, Plaintiff, by and through his undersigned counsel and The Law

Offices of Peter T. Nicholl, hereby submits his Complaint against UNDER ARMOUR, INC.,

Defendant, to recover unpaid wages, liquidated damages, interest, reasonable attorneys' fees and

costs under Section 16(b) of the Federal Fair Labor Standards Act of 1938, as amended, 29 U.S.C.

§§ 201, *et seq.* (hereinafter, "FLSA"); unpaid wages, liquidated damages, interest, reasonable

attorneys' fees and costs under Maryland Wage and Hour Law, Md. Code Ann., Lab. & Empl. §§

3-401, *et seq.* (hereinafter, "MWHL"); and unpaid wages, interest, treble damages, reasonable

attorneys' fees and costs under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl., §§ 3-501, *et seq*. (hereinafter, "MWPCL"), and in support thereof, states as follows:

## INTRODUCTION AND BACKGROUND

Defendant is in the business of distributing athletic apparel, footwear and accessories. Defendant's business model is based on developing these products for sale. Defendant's products are sold to third party retailers and consumers through its website and physical storefronts. Defendant's storefronts are divided into two (2) distinct subclasses: Brand House and Factory Stores. Brand House functions as Defendant's high-end retail branch; Factory Stores are direct-to-consumer outlets offering lower prices.

Defendant conducts business on a global scale and has numerous physical stores. To determine the inventory needs of its stores, Defendant staffs allocation analysts ("analysts") in its Brand House and Factory Store departments. Defendant employs similar analysts in other branches, which includes its Wholesale Retail and Internet Sales departments.

Plaintiff and other similarly situated employees worked as analysts for Defendant. They were primarily responsible for generating weekly reports specific to inventory. They were tasked with performing standard data searches and compiling their findings. Their tasks centered on identifying "key performance indicators" to monitor store intake and sales. The extent of Plaintiff's and other analysts' duties was completing this data entry and manipulation process. They received weekly goals regarding what inventory needed to be analyzed. They would spend their weeks gathering data from excel spreadsheets and generating template reports. Their primary duties were a matter of routine.

Plaintiff's and other analysts' tasks were determined by Defendant's specific instructions. They had no authority to act on their own. They could not exercise any discretion. Plaintiff and

other analysts lacked the authority to exercise independent judgment. They had to do exactly what they were told.

Plaintiff and other analysts were required to meet strict deadlines. Finishing their assigned work before each deadline was critical. Defendant made this absolutely clear. This required Plaintiff and other analysts to routinely work late. They had to put in extra time on the weekends. They had no choice but to work outside of their regular schedules.

Understaffing was a major problem as well. It was Defendant's practice to regularly understaff its office. There were not enough analysts to meet the needs of Defendant's business. There was simply too much work and not enough employees. Because of their heavy workload, Plaintiff and other analysts would routinely find themselves working from 7:00 a.m. to 6:00 p.m. during the week. It was also necessary for them to work on the weekends. The sheer volume of assignments required them to work excessive hours. Plaintiff and other analysts routinely worked fifty (50) to sixty (60) hours each week. There were times when they worked even more.

Based on the reputation of the employer, Plaintiff believed he would be performing complex analytical work. However, this was not the case. Defendant's upper management officials acknowledged that Plaintiff was not doing "true analysis." The work that Plaintiff and other analysts performed was primarily data entry. Their tasks centered on merely entering information into Defendant's database. No analysis was required. Advanced education or specialized training was not needed; nothing about their job that was complex.

Although Plaintiff's and other allocation analysts' job title may raise the inference that they were exempt employees, the title was just a façade. Their work was routine and clerical in nature. The nature of their work makes clear they were misclassified. Defendant classified its analysts as salaried employees in order to avoid the overtime requirements. Plaintiff and other analysts should

have been paid overtime ("time and a half") wages for all hours worked over forty (40) each week. They never received these wages.

By paying its analysts a salary, Defendant evaded the payment of wages owed to Plaintiff and others similarly situated. This conflicts with the standards set forth by the FLSA, MWHL and the MWPCL. Defendant is currently engaged in this unlawful activity. This mandated the filing of this Complaint.

## THE PARTIES

1.      Plaintiff Stephen Brianas (hereinafter, "Plaintiff") is an adult resident of Baltimore City, Maryland.

2.      Defendant Under Armour, Inc. (hereinafter, "Defendant") is an incorporated for profit business. [1]

3.      Defendant's principal office is in Baltimore City, Maryland.

4.      Defendant's business centers on the distribution of athletic apparel.

5.      Defendant distributes and sells clothing, footwear and accessories to third party consumers.

6.      Due to the nature of its business, Defendant is subject to the FLSA, MWHL and the MWPCL.

7.      Defendant is also subject to the FLSA, MWHL and the MWPCL due to the revenues it generates.

---

[1] Any reference to Defendant shall include its corporate officers and all those empowered to act as agents of the corporation either, explicitly or implicitly, or who are designated as agents under the doctrine of apparent agency. To the extent individual agents are responsible for any actions alleged in this Complaint, they are hereby incorporated by reference within the term "Defendant."

8. Defendant's annual dollar volume of business exceeds five hundred thousand dollars ($500,000.00).

9. Plaintiff engaged in interstate commerce based on the duties he performed as part of his employment with Defendant.

10. Plaintiff worked for Defendant who, at all times throughout Plaintiff's employment, fell within the definition of the term "employer" under the FLSA, 29 U.S.C. § 203(d), MWHL, § 3-401(b) and the MWPCL, § 3-501(b).

11. Plaintiff and others similarly situated worked as non-exempt employees for Defendant.

12. The duties assigned to Plaintiff and other similarly situated employees did not satisfy the duties tests contained within the exemptions specified in the FLSA, MWHL, or the MWPCL.

13. From 2011 until approximately June 1, 2017, Plaintiff was employed with Defendant.

14. For the entirety of the relevant period, Plaintiff held the title of allocation analyst ("analyst").

15. Plaintiff performed duties specific to data entry.

16. Defendant had the authority to control Plaintiff's duties and the duties of others similarly situated.

17. Defendant's agents were, individually and together, actively engaged in the management and direction of Plaintiff and other similarly situated employees.

18. Defendant controlled the administration of its business and set employee schedules, including those of Plaintiff and others similarly situated.

19.     Defendant possessed and exercised authority to determine the hours worked by Plaintiff and other analysts.

20.     Defendant had and exercised the power to change the course of Plaintiff's and other similarly situated employees' tasks.

21.     Plaintiff and members of the putative class recognized Defendant's authority and obeyed Defendant's instructions.

22.     Defendant made all decisions relating to Plaintiff's and other similarly situated employees' rates and methods of pay.

## JURISDICTION AND VENUE

23.     Original jurisdiction in this Honorable Court is expressly provided by FLSA, 29 U.S.C. § 207, *et seq*.  This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, as this matter presents a federal question.

24.     Discretionary supplemental jurisdiction of Plaintiff's Maryland state law claims is provided by 28 U.S.C. § 1367(a); the state law claims form part of the same case or controversy and derive from a common nucleus of operative facts, on which Plaintiff's federal claims are based.

25.     No reasons exist that would force this Honorable Court to decline jurisdiction; the state law claims (i) do not raise novel or complex issues of state law, (ii) do not substantially predominate the claims over which this Honorable Court has original jurisdiction and (iii) no exceptional circumstances exist that would constitute a compelling reason for declining jurisdiction, thereby satisfying 28 U.S.C. 1367(c).

26.     Pursuant to 28 U.S.C. § 1391(b), venue is appropriate; the unlawful acts central to this matter occurred primarily within the State of Maryland.

27.     This Honorable Court has personal jurisdiction over Defendant; Defendant is a corporation incorporated under the laws of Maryland and conducts sufficient business within the forum state so as to constitute a submission to its laws.

## FACTUAL ALLEGATIONS FOR ALL CLAIMS

28.     Defendant is in the business of developing, distributing and selling athletic apparel, footwear and accessories.

29.     The distribution end of Defendant's business requires massive amounts of logistical coordination. The inventory needs of Defendant's brick-and-mortar stores were constantly changing. The identification of various patterns required a level of human involvement.

30.     To this end, Defendant hired Plaintiff and other similarly situated employees to work as allocation analysts ("analysts"). Their focus was to determine Defendant's inventory needs at its various retail stores.

31.     Plaintiff performed his work at Defendant's corporate office in Baltimore, Maryland. He was assigned to Defendant's Brand House department.

32.     Defendant also employed analysts in its other departments. This includes its Factory Stores, Wholesale Retail and Internet Sales departments.

33.     Regardless of the department to which they were assigned, Plaintiff's and other analysts' duties centered on data entry.

34.     Despite their title, Plaintiff and others similarly situated performed little to no actual analysis. Their tasks primarily involved routine clerical work. Their work largely consisted of simply pulling information from Defendant's software. There were basic protocols involved with completing this work.

35.     Plaintiff and other similarly situated employees used Defendant's software to determine inventory needs. Plaintiff and other analysts were given weekly assignments relating to what inventory data needed to be examined. Examining the data was accomplished through pre-determined procedures.

36.     Plaintiff and other analysts had to first "craft the data." The inventory database was immense and accounted for all transactions and deliveries that occurred in Defendant's retail stores. This data had to be condensed and filtered into usable information.

37.     Plaintiff and other analysts used Defendant's database to compile the information. Defendant's software was all that was needed to produce the information required. Plaintiff and other analysts would perform searches for the specific information related to their assignments. Once the information was gathered, the software would compile the data and transport it into excel spreadsheets.

38.     A series of built in formulae were already programmed within the spreadsheets, which would automatically process all the relevant calculations.  The formulas were programmed to break down products by type, color, size and similar metrics. The quantity of all relevant products could also be determined. The formulae identified where there were inventory surpluses and shortfalls.

39.     The calculations would result in a series of indicators specific to inventory concerns. Defendant referred to these indicators as "key performance indicators" (hereinafter, "KPIs").  Plaintiff and other analysts were responsible for identifying KPIs uncovered in the crafting stage and generating reports based on their findings.

40.     Plaintiff's and other analysts' primary duty was to create the reports designed to identify the KPIs. Completion of this task required time consuming data entry. The information

generated by the spreadsheets had to be inputted into formulaic reports. The reports were for the purpose of explaining how the information gathered correlated with inventory needs.

41.     The reports Plaintiff and other analysts generated were simple lists of data. They were responsible for assembling the lists into a format that was easy to review. This was for the purpose of identifying stores where Defendant had too much product, insufficient product, or related concerns.

42.     Plaintiff's and other analysts' daily tasks centered on reporting these concerns. Their assignments focused on the data processing aligned with Defendant's routine reporting procedures.

43.     The frequency in which they were given their assignments was based on Defendant's needs. These needs were communicated to Plaintiff and other analysts through "goals" set by Defendant's managers.  The goals served as the framework to Plaintiff's and other analysts' workweek

44.     Plaintiff and others similarly situated had no say regarding their weekly goals. They could not choose the assignments they were to complete. They were required to follow Defendant's specific instructions.

45.     Plaintiff and other analysts were required to complete their assignments in the manner prescribed. They had no say regarding the order in which their assignments were completed. Defendant made clear to its analysts that they were to carry out their work in the exact manner commanded.

46.     Meeting Defendant's goals was the focus of Plaintiff's and other analysts' employment. They would spend their entire week completing their goals. They would spend the following week completing a new set of goals they were assigned.

47.     Completing their goals was simply a matter of routine. The data processing that Plaintiff and other analysts had to complete was most akin to work performed on an assembly line. Their work was essentially the compilation and transmission of data. Following Defendant's procedures was all that was needed to produce this work.

48.     While performing their production tasks, Plaintiff and other analysts did not require any specialized training or advanced knowledge.

49.     Rather than actually making substantive determinations themselves, Plaintiff and other analysts were solely responsible for generating reports. These reports were then given to higher level personnel for review.

50.     Plaintiff and other analysts did not have any decision making authority.

51.     Plaintiff and other analysts did not have any input regarding the manner in which their tasks were completed.

52.     Plaintiff and others similarly situated were not involved with any policy decisions.

53.     Plaintiff and other similarly situated employees had no involvement with the day-to- day operations of Defendant's business.

54.     Plaintiff and other analysts were not involved with any management concerns.

55.     Plaintiff and other similarly situated employees did not have the authority to hire or fire employees.

56.     Plaintiff and others similarly situated did not supervise any employees.

57.     Plaintiff and other analysts were always supervised by Defendant's managers.

58.     Plaintiff and other similarly situated employees were required to follow management's instructions.

59.     Plaintiff and other analysts performed their duties to the extent required by Defendant.

60.     Plaintiff and other analysts satisfied the requirements of their job and adequately performed their duties to benefit Defendant.

61.     Plaintiff and other allocation analysts were all paid a salary. They received the same bi-weekly payments regardless of the number of hours they worked each week.

62.     From 2011 to 2013, Plaintiff's annual salary was approximately fifty thousand dollars ($50,000.00).

63.     In 2013, Plaintiff's salary increased to approximately fifty-five thousand dollars ($55,000.00) a year.

64.     In 2016, Plaintiff received another raise, at which time his annual salary increased to sixty-one thousand dollars ($61,000.00). This was his salary until the time his employment ended.

65.     Plaintiff and other analysts were scheduled to work five (5) days a week. They were told they were to work forty (40) hours each week.  They were to work a typical Monday through Friday schedule. Their schedule was supposed to be from 8:00 a.m. to 5:00 p.m., which was to include a break for lunch.  However, the hours they actually worked were far in excess of their scheduled hours.

66.     Due to the demands of his workload, it was common for Plaintiff to arrive to work prior to his scheduled start time. He would also leave work after his shifts were scheduled to end. It was routine for Plaintiff to work from 7:00 a.m. to 6:00 p.m. each day during the week. The demands of his employment left no other choice.

67.     Other analysts worked similar schedules. Their heavy workload also required them to report to work before their shifts were scheduled to begin and leave work after their shifts were supposed to end.

68.     Due to the demands of their employment, Plaintiff and other analysts were also required to work from home. It was common for Plaintiff and other analysts to continue to perform work at home after they left the office. Their heavy workload required them to put in the extra time.

69.     Their workload also required Plaintiff and other analysts to regularly work on the weekends.  Working on the weekends was the primary means in which they prepared for the upcoming week's work.

70.     Plaintiff would regularly spend up to six (6) to ten (10) hours working on the weekends. He consistently worked on Saturdays and Sundays.  This was the only way he could meet the strict deadlines imposed by Defendant.

71.     The same deadlines also resulted in other analysts working similar hours on the weekends. Defendant's analysts always received a constant flow of work. All of their work had hard deadlines associated with its completion. These requirements forced Plaintiff and other analysts to work hours outside of their regular schedules.

72.     Understaffing also contributed to Plaintiff and other analysts having to work hours outside of their schedule. It was the primary cause of Plaintiff and other analysts having to work overtime.

73.     Throughout the course of Plaintiff's employment, Defendant's Brand House department never had enough personnel. There would rarely be more than two (2) other analysts

staffed in Plaintiff's department. This was not a sufficient number to meet the demands of Defendant's business. The constant data entry and database processing required additional help.

74.     Defendant failed to provide the personnel needed. Consequently, Plaintiff and other analysts were assigned far more work than they could reasonably complete within a forty (40) hour week. Nevertheless, it was necessary that they complete all of their assignments each week, regardless of the amount of time that it took.  Having to complete all of their assignments within each specified deadline resulted in Plaintiff and other analysts having to consistently work hours outside of their schedules.

75.     During certain periods throughout his employment, chronic understaffing resulted in Plaintiff having to work even more overtime. At times, he was the only employee in his department. This required Plaintiff to perform an amount of work that could have easily been assigned amongst an entire division of analysts. This period of his employment coincided with when Defendant's business was growing. Defendant's business expanded at a rapid pace, leading to an increase in Plaintiff's workload.

76.     As a result of this increase, it was impossible for Plaintiff to complete his assignments within regular business hours.  This frequently required Plaintiff to work as many as eleven (11) hours or more each day.

77.     Oher analysts were subject to these same requirements. The expansion of Defendant's business also caused their workloads to increase. They also regularly worked in the office for eleven (11) hours or more each day.

78.     The expansion of Defendant's business also caused Plaintiff and other analysts to work on the weekends. Their excessive workload led them to regularly fall behind on their duties. Plaintiff and other analysts were forced to work extra hours to ensure the timely completion of

their assignments. These time constraints routinely resulted in Plaintiff and other analysts working seven (7) days a week.

79.      Another major issue which led to Plaintiff and other analysts working overtime was the software itself. They were required to use Defendant's allocation system. The system did not function as Defendant intended. In large part, the hours of additional work that Plaintiff and other analysts performed was a direct result of the system. If the system had been automated to a greater degree, Plaintiff's and other analysts' tasks would not have taken as long.

80.      As a result of all of these conditions, Plaintiff and other analysts consistently worked as many as sixty (60) hours each week. Their multiple assignments led overtime to become the norm. Working over forty (40) hours a week was routine.

81.      Plaintiff and other analysts should have been paid overtime ("time and a half") wages for the hours they worked over forty (40) each week. However, they were denied overtime wages altogether.

82.      Defendant accomplished these illegal acts by misclassifying Plaintiff and other analysts as salaried employees. As a result of this misclassification, they received the same bi-weekly payments regardless of the number of hours they worked each week.

83.      Plaintiff and others similarly situated were not compensated at a rate of "time and a half" their regular rate of pay when they worked over forty (40) hours in a week.  They failed to receive proper payments for the excessive hours they worked. This continued for the duration of their employment.

84.      There is no bona fide dispute that Plaintiff and other similarly situated employees are owed overtime wages for all hours worked over forty (40) in a week.

85.     The duties performed by Plaintiff and other analysts did not implicate any exemptions contained within the FLSA, MWHL, or the MWPCL.

86.     Defendant was well aware that Plaintiff and others similarly situated retained no discretion in the performance of any of their assigned tasks.

87.     Defendant knew that the nature of the tasks performed by its analysts entitled them to overtime wages.

88.     Defendant knew of the excessive hours worked by Plaintiff and other analysts. Defendant's managers were consistently present in Plaintiff's and other similarly situated employees' work area.

89.     Defendant was well aware that Plaintiff and other analysts customarily worked well over forty (40) hours per week.

90.     Defendant suffered, permitted, or in fact required Plaintiff and other similarly situated employees to work these overtime hours.

91.     Acting without good faith, Defendant withheld the overtime wages owed to Plaintiff and other analysts.

92.     Throughout his employment, Plaintiff made consistent complaints in regard to the overtime hours he worked. Despite his numerous complaints, nothing was done to change the manner in which Plaintiff and other analysts were paid.

93.     Consequently, on behalf of himself and all those similarly situated, Plaintiff seeks the wages to which they are entitled and other available relief through this Complaint.

## **FLSA COLLECTIVE ACTION ALLEGATIONS**

94.     Plaintiff and other similarly situated employees work or worked as allocation analysts ("analysts") for Defendant. Defendant employs analysts in all of its departments, including its Brand House, Factory Stores, Wholesale Retail and Internet Sales divisions.

95.     The FLSA requires employers to pay overtime wages to non-exempt employees such as Plaintiff and others similarly situated for all hours worked over forty (40) each week.

96.     Defendant knew that Plaintiff and similarly situated employees typically worked over forty (40) hours per week.

97.     Defendant suffered and/or permitted Plaintiff and other analysts to work more than forty (40) hours per week.

98.     Defendant knew or should have known that Plaintiff and those similarly situated were entitled to overtime pay for all hours worked over forty (40) in a workweek.

99.     Pursuant to the FLSA, Plaintiff commences this collective action against Defendant on behalf of himself and all those similarly situated.

100.    Plaintiff demands damages reflecting an overtime rate of not less than one and a half (1.5) times his regular rate of pay for all hours worked over forty (40) in any workweek within the applicable statute of limitations.  Plaintiff makes these same demands on behalf of all members of the putative class.

101.    Plaintiff consents to be party plaintiff in this matter.  Plaintiff's consent form is attached to this Complaint as Exhibit A.

102.    It is likely that other individuals will join Plaintiff during the litigation of this matter and file written consents to "opt in" to this collective action.

103.     There are numerous similarly situated current and former employees of Defendant that have been harmed by Defendant's common scheme to underpay its analysts and violate the FLSA.

104.     These similarly situated persons are known to Defendant and are readily identifiable through Defendant's records.

105.     Many of these similarly situated employees would benefit from the issuance of court-supervised notice, granting them the opportunity to join this lawsuit.

106.     Upon information and belief, others will choose to join Plaintiff in this action and choose to opt in to this lawsuit for purposes of recovering unpaid wages and seeking all other available relief.

## CLASS ACTION ALLEGATIONS UNDER MARYLAND WAGE LAWS

107.     Plaintiff brings this action Pursuant to Rule 23 of the Federal Rules of Civil Procedure.

108.     Plaintiff brings this action on behalf of himself and other current and former employees that served as allocation analysts ("analysts") for Defendant and were subject to the following practices and policies:

109.     Denial of overtime wages under MWHL for all hours worked over forty (40) in a single workweek; and

110.     Denial of all wages owed to Plaintiff and other similarly situated employees at the termination of their employment, in violation of the MWPCL.

111.     The classes Plaintiff seeks to represent are defined as:

    a.     *MWHL Class*: All individuals who are or were employed by Defendant as allocation analysts for any period ranging from three (3) years prior to the filing of

the instant Complaint to the present and who were not paid an overtime rate of "time and a half" their regular rate for all hours worked over forty (40) in a workweek.

b.     *MWPCL Class*: All individuals who were, but are no longer, employed by Defendant as allocation analysts for any period ranging from three (3) years from when the instant Complaint was filed to the present and who were not paid an overtime rate of "time and a half" their regular rate for all hours worked over forty (40) in a workweek and thus, did not receive all wages owed to them before the termination of their employment.

112.    *Numerosity*: The individuals in the class are so numerous that joinder of all members is impracticable.  Although the precise number of such individuals is currently unknown, the class includes dozens of current and former employees who are readily identifiable through Defendant's pay records.  These employees were staffed at Defendant's corporate office(s). They all worked in Defendant's Brand House, Factory Stores, Wholesale Retail, or Internet Sales departments.

113.    *Commonality*: There are questions of law and fact common to the classes.  Among the common questions of law and fact applicable to Plaintiff and the classes are:

a.     Whether the MWHL class is similarly situated because they were subject to Defendant's common policy and practice of not paying overtime ("time-and-a-half") pay to its employees.

b.     Whether Defendant employed the MWHL class within the meaning of MWHL;

c. Whether Defendant violated MWHL by failing to pay Plaintiff and the MWHL class overtime compensation for hours worked in excess of forty (40) hours per workweek;

d. Whether Defendant's violations were willful;

e. Whether Defendant employed the MWPCL class within the meaning of the MWPCL;

f. Whether Defendant failed to provide Plaintiff and other members of the MWPCL class with all wages due at the time their employment ended; and

g. Whether Defendant is liable for damages claimed herein, including but not limited to, compensatory, liquidated or treble, statutory, interest, costs and attorneys' fees.

114. *Typicality*: Plaintiff's claims are typical of those of the classes. Each and every class member of both the MWHL class and the MWPCL class work or worked as an analyst in one of Defendant's departments. Heavy workloads, understaffing and high turnover rates required each and every MWHL class member to work substantially over forty (40) hours each week. It was Defendant's common policy not to compensate its employees for working these overtime hours. Defendant's unlawful practices were well documented. Defendant also failed to pay Plaintiff and other members of the MWPCL class all wages owed to them at the conclusion of their employment. This constitutes a direct violation of MWHL, as well as a subsequent violation of the MWPCL.

115. *Adequacy*: Plaintiff will fully and adequately protect the interests of the classes. He seeks the same recovery as the classes, predicated upon the same violations of the law and the same damage theory. Plaintiff has also retained counsel who are qualified and experienced in the

prosecution of statewide wage and hour class actions. Neither Plaintiff nor his counsel have interests that are contrary to, or conflicting with, the interests of the classes.

116. *Predominance*: The common issues of law and fact predominate over any individual issues. Each class member's claim is controlled by Maryland's wage and hour statutory scheme and one (1) set of facts. This is based on Defendant's failure to pay overtime as required by MWHL and its subsequent failure to pay all wages due at the end of an individual's employment as required by the MWPCL. Similarly, the damages are eminently certifiable in that Defendant's records will provide the amount and frequency each class member was paid.

117. This action is maintainable as a class action. The prosecution of separate actions by individual members of the classes would create a risk of inconsistent or varying adjudications with respect to individual members of the classes. This would establish incompatible standards of conduct for Defendant. If they were to pursue their claims separately, the numerous adjudications that would be required to protect the individual interests of the class members would constitute a drain and burden on judicial resources. Accordingly, the Court should certify the proposed classes.

## CAUSES OF ACTION AND VIOLATIONS OF LAW

### *Count I - Violation of the FLSA: Failure to pay overtime wages to Plaintiff and all members of the collective class*

118. Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

119. Plaintiff is entitled to overtime under 29 U.S.C. § 207(a), which provides that employers must compensate their employees for hours worked in excess of forty (40) in a workweek at a rate of not less than one and one-half (1.5) times the regular rate at which they are employed.

120.    As described above, Plaintiff has not received from Defendant compensation reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a workweek; Defendant failed to compensate Plaintiff for these additional hours.

121.    Defendant willfully and intentionally failed to compensate Plaintiff for the overtime wages he is owed.

122.    There is no bona fide dispute that Plaintiff is owed overtime wages for work performed for Defendant.

123.    Under the FLSA, Plaintiff is entitled to additional wages from Defendant to compensate him for the hours he worked in excess of forty (40) in a workweek at a rate of one and one-half (1.5) times his regular hourly wage rate.

### *Count II.  Violation of MWHL: Failure to pay overtime wages to Plaintiff and all members of the class*

124.    Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

125.    Pursuant to Md. Code Ann., Lab. & Empl. § 3-415, each employer shall pay an overtime wage of at least one and one half (1.5) times the regular hourly rate.

126.    Pursuant to Md. Code Ann., Lab. & Empl. § 3-420(a), an employer shall compute the wage for overtime under Md. Code Ann., Lab. & Empl. § 3-415 on the basis of each hour over forty (40) that an employee works during one (1) workweek.

127.    Plaintiff has not received compensation from Defendant reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a week.

128.    Defendant willfully and intentionally did not compensate Plaintiff for the overtime wages he is owed.

129.    There is no bona fide dispute that Plaintiff is owed overtime wages for work performed for Defendant.

130.    Under MWHL, Plaintiff is entitled to additional wages from Defendant for all overtime hours worked at a rate of one and one-half (1.5) times his regular hourly wage rate.

### *Count III - Violation of the MWPCL: Failure to pay wages owed at the termination of Plaintiff's and the class members' employment*

131.    Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

132.    Plaintiff is entitled to wages under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§3-501 *et. seq*., which provides that each employer shall pay an employee all wages due for work that the employee performed before the end of employment, on or before the day on which the employee would have otherwise been paid the wages.

133.    Plaintiff has not received compensation from Defendant for all wages owed for work performed before the termination of his employment as required by Md. Code Ann., Lab. & Empl. §3-505(a).  This is specific to Defendant's failure to pay Plaintiff the overtime wages to which he is entitled.

134.    Defendant willfully and intentionally did not compensate Plaintiff for the wages owed to him and continued to violate the MWPCL, even after Plaintiff informed Defendant of the violation.

135.    Under the MWPCL, there is no bona fide dispute that Plaintiff is owed wages for work performed while employed by Defendant.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and others similarly situated, prays for the following relief:

a)      In accordance with 29 U.S.C. § 216(b), designation of this action as a collective action on behalf of Plaintiff and those similarly situated;

b)      Ordering Defendant to disclose in computer format, or in print if no computer readable format is available, the names, addresses, and emails of all those individuals who are similarly situated and permitting Plaintiff to send notice of this action to all those similarly situated individuals;

c)      Designating the named Plaintiff to act as class representatives on behalf of all similarly situated employees for the FLSA collective class;

d)      Judgment against Defendant for its failure to pay Plaintiff and those similarly situated in accordance with the standards set forth by the FLSA;

e)      Judgment against Defendant for its failure to pay Plaintiff and those appropriately joined to this matter in accordance with the standards set forth by MWHL;

f)      Judgment against Defendant for its failure to pay Plaintiff and those appropriately joined to this matter in accordance with the standards set forth by the MWPCL;

g)      Judgment against Defendant and classifying its conduct as willful and not in good faith;

h)      Judgment against Defendant and classifying Plaintiff the collective class and those appropriately joined in this matter as non-exempt employees entitled to protection under the FLSA, MWHL and the MWPCL;

i)      An award against Defendant for the amount of unpaid overtime wages owed to Plaintiff and those similarly situated, calculated at a rate that is not less than one and a half (1.5) times Plaintiff and other similarly situated employees' regular hourly rate for all overtime hours worked;

j)      An award of liquidated or trebled damages equal to, or double, the total amounts of unpaid wages owed to Plaintiff and those similarly situated, whichever is deemed just and equitable by this Honorable Court;

k)      An award of reasonable attorneys' fees and all costs, plus pre-judgment and post-judgment interest, to be satisfied in full by Defendant;

l)      Leave to add additional Plaintiff to all claims by motion, through the filing of written consent forms, or any other method approved by this Honorable Court; and

m)      All further relief deemed just and equitable by this Honorable Court.

## **REQUEST FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests that a jury of his peers hear and decide all possible claims brought on behalf of Plaintiff and those similarly situated.

Respectfully submitted,

*/s/ Benjamin L. Davis, III*
Benjamin L. Davis, III, Esq. (29774)
bdavis@nicholllaw.com
Joseph E. Spicer, Esq. (27839)
jspicer@nicholllaw.com
The Law Offices of Peter T. Nicholl
36 South Charles Street, Suite 1700
Baltimore, Maryland 21201
Phone No.: (410) 244-7005
Fax No.:    (410) 244-8454

*Attorneys for Plaintiff*